IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>LANCE LAPAE MONDEN,<br>STANLEY EARL MOSLEY, JR.,<br>and KATHERINE AMANDA PIHL,<br><br>　　　　Defendants. | Case No. CR16-0051<br><br>REPORT AND RECOMMENDATION |

TABLE OF CONTENTS

I.   INTRODUCTION .................................... 2

II.  PROCEDURAL HISTORY ............................ 2

III. RELEVANT FACTS ................................. 2

IV.  ISSUES PRESENTED ............................... 5

V.   DISCUSSION ...................................... 6
     A.  Standing to Challenge the Vehicle Stop ...... 6
     B.  Legality of the Vehicle Stop ................ 6
     C.  Length of the Vehicle Stop .................. 8
     D.  Standing to Challenge the Trunk Search ..... 10
     E.  Legality of the Trunk Search ............... 16
     F.  Fruit of the Poisonous Tree ................ 19

VI.  SUMMARY ....................................... 19

VII. RECOMMENDATION ............................... 20

## I. INTRODUCTION

On the 18th day of July 2016, this matter came on for hearing on the Motion to Suppress (docket number 40) filed by Defendant Stanley Earl Mosley, Jr. on July 7, 2016; the Motion to Suppress (docket number 43) filed by Defendant Lance Lapae Monden on July 8; and the Motion to Suppress (docket number 47) filed by Defendant Katherine Amanda Pihl on July 13. The Government was represented by Assistant United States Attorney Anthony Morfitt. Defendant Monden appeared in court and was represented by his attorney, Christopher J. Nathan. Defendant Mosley appeared and was represented by attorney Cory J. Goldensoph. Defendant Pihl appeared and was represented by Dennis E. McKelvie.

## II. PROCEDURAL HISTORY

On June 8, 2016, Defendants Monden, Mosley, and Pihl were charged by indictment with one count of bank robbery and aiding and abetting bank robbery. Defendants have all appeared and entered pleas of not guilty. Trial was scheduled before Chief Judge Linda R. Reade on August 29, 2016. The case was subsequently reassigned to Judge Leonard T. Strand.

All three defendants timely filed motions to suppress. In addition, Defendants joined in the motions filed by their co-Defendants.

## III. RELEVANT FACTS

Most of the facts underlying the instant motions are undisputed. At 2:35 p.m. on May 20, 2016, two men wearing gray hooded sweatshirts and masks entered and robbed the Palo Savings Bank. The robbers entered and exited the south entrance of the bank. The robbers were in the bank for precisely one minute.[1]

---

[1] A video recording of the interior of the bank, showing the robbery, was introduced as Government's Exhibit 5.

The bank is located at the corner of Main Street and 1st Street in Palo. As it happened, four men returning home from a golf outing were in a pickup truck driving north on 1st Street when they saw two men wearing hooded sweatshirts come out of the bank and run to the southeast, toward a park. Finding that suspicious, the men decided to drive around the block and head back to the bank.[2] When they got back to the area of the bank, the men in the pickup truck could no longer see the two men in hooded sweatshirts whom they had seen running. However, the men observed a gray Ford Taurus leaving the area of the bank and they believed it may have been involved in a bank robbery, so they decided to follow it. The men also called the bank.

At the same time, an employee at the bank called 911 and advised the dispatcher that the bank had been robbed. The men in the pickup were on the "other line" as the bank employee was talking to the 911 dispatcher. The banker told the dispatcher that the men in the pickup were "following them." It was reported that the subject vehicle was a gray Taurus heading south on Highway 94 toward Cedar Rapids. It was also reported that there was "only one person in it now, but they saw two of them running from the bank." The banker confirmed that the bank was robbed by two "subjects," with both subjects wearing gray hooded sweatshirts and black masks. It was also reported that at least one of the subjects was African American.[3]

At the time the 911 call came in, Linn County Deputy Sheriff James Uher was on patrol in Cedar Rapids. Uher activated his emergency lights and siren and proceeded on Rogers Road toward Highway 94 (also known as Covington Road).[4] Uher was advised by

---

[2] The pickup continued north on 1st Street to Vinton Street (one block north of Main Street), turned right on Vinton Street and proceeded one block, turned right again on Iowa Street and proceeded one block, and then turned right on Main Street and proceeded back to 1st Street.

[3] An audio recording of the 911 call was introduced as Exhibit 1.

[4] A video recording taken out of the front of Deputy Uher's patrol car was introduced as Exhibit (continued...)

3

the dispatcher that the bank had been robbed by two men wearing gray hooded sweatshirts, one of whom was African American. He was also advised that the subjects were heading southbound on Highway 94 in a gray Taurus. Upon arriving at Highway 94, Uher turned right and proceeded north toward Palo. Less than 30 seconds later, however, Uher observed a gray Ford Taurus heading in the opposite direction (*i.e.*, southbound on Highway 94 toward Cedar Rapids). Uher turned around and stopped the vehicle at the corner of Highway 94 and Rogers Road.

After the gray Taurus was stopped, but before Deputy Uher approached the driver, the dispatcher advised that the men in the pickup truck were now reporting that the gray Taurus "may not be involved." As Uher was talking to the driver of the gray Taurus (Defendant Pihl), the dispatcher called the men in the pickup truck directly. The men reported they had pulled up next to the subject vehicle and, after seeing a woman driver with no one else in the vehicle, concluded it was not involved in the robbery. The men also confirmed that while they saw two men running from the bank, they did not see the men get into the gray Taurus. They initially believed the vehicle was involved because it was leaving the area at the same time.

Deputy Uher called dispatch and asked "do you want me to hang on to this or no?" Uher then told Pihl that she was free to go. Just as the gray Taurus started to move, Uher was instructed by another deputy on the radio to find out what Pihl was doing and where she was coming from. Uher apparently called to Pihl and the gray Taurus stopped after traveling just a few feet.[5] As Uher was obtaining additional information, another vehicle

---

[4](...continued)
3.

[5] Portions of the conversation which occurred on the radio can be heard from the microphone in Deputy Uher's patrol car. Apparently, however, Uher did not have his body mic turned on, or it was inoperable, because the recording does not have the discussion which occurred between Uher and Pihl at the car.

4

containing two sheriff's deputies pulled up. The dispatcher advised again that the witnesses no longer believed the vehicle was involved in the robbery. Uher then reported on the radio that he "got her information" and was going to "cut her loose." Almost immediately, another deputy on the radio advised Uher to "check the trunk real quick."

At the hearing, Deputy Uher testified on direct examination that he "requested" that Pihl open the trunk by saying "hey, can you pop the trunk?" On cross-examination, however, Uher stated that he said "hey, pop the trunk of your car." Uher acknowledged that the second phrasing was more of a "directive, rather than a request." Upon opening the trunk, the deputies discovered Monden and Mosley wearing gray hooded sweatshirts, with one still wearing a mask, and the bank loot spilling from their pockets. From the time the vehicle was pulled over until Defendants were found in the trunk was approximately 3 minutes 30 seconds.

As part of its investigation, the sheriff's office then applied for and received a search warrant for the vehicle. *See* Government's Exhibit 11. Defendants apparently concede the search warrant application establishes probable cause for the issuance of the warrant, but argue that because the information contained in the application was obtained as a result of an illegal vehicle stop and unlawful search of the trunk, the search warrant is "fruit of the poisonous tree."

## IV. ISSUES PRESENTED

The various motions to suppress and the Government's resistance raise six issues to be addressed by the Court:

1. Do Defendants have standing to challenge the legality of the vehicle stop?
2. Was the vehicle stop supported by reasonable suspicion of criminal activity?
3. Did the vehicle stop exceed the length of time authorized by the Fourth Amendment?

5

4. Do Defendants have standing to challenge the legality of the search of the trunk?

5. Was the search of the trunk supported by probable cause?

6. Is the search warrant authorizing a search of the vehicle fruit of the poisonous tree?

## V. DISCUSSION

### A. Standing to Challenge the Vehicle Stop

Apparently anticipating an argument by the Government, Defendant Mosley identifies one of the issues as whether, as a passenger in the vehicle, he has standing to challenge the vehicle stop. In *Brendlin v. California*, 551 U.S. 249, 251 (2007), the Court held that when a police officer makes a traffic stop, both the driver and a passenger are "seized" and, therefore, a passenger may challenge the constitutionality of the stop. The Court concluded that "during a traffic stop an officer seizes everyone in the vehicle, not just the driver." *Id.* at 255. Mosley argues that this bright line rule applies, even if the "passenger" is hiding in the trunk.

The Government did not respond to the argument in its resistance and, apparently, concedes the point. Absent any authority to the contrary, I believe all occupants of the subject vehicle have standing to challenge the legality of the vehicle stop, despite the fact that two of them were hiding in the trunk.

### B. Legality of the Vehicle Stop

The law regarding vehicle stops is well-established. "A traffic stop constitutes a seizure for purposes of the Fourth Amendment and therefore must be supported by probable cause or reasonable suspicion." *United States v. Givens*, 763 F.3d 987, 989 (8th Cir. 2014). "The Fourth Amendment permits investigative traffic stops when law enforcement has reasonable suspicion of criminal activity." *United States v. Tamayo-Baez,*

6

820 F.3d 308, 312 (8th Cir. 2016) (citing *Navarette v. California*, \_\_\_\_ U.S. \_\_\_\_, 134 S. Ct. 1683, 1687 (2014)).

> "Reasonable suspicion exists when an 'officer is aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed.'" "While reasonable suspicion must be more than an inchoate hunch, the Fourth Amendment only requires that police articulate some minimal, objective justification for an investigatory stop."

*Id.* (all citations omitted). In determining whether an officer had "reasonable suspicion of criminal activity," the Court considers the totality of circumstances. *Id.*

Here, Deputy Uher was advised over the radio that the Palo State Bank had been robbed. Uher, who was in Cedar Rapids, proceeded toward Palo, heading west on Rogers Road and then north on Highway 94. While en route, Uher was advised that a gray Ford Taurus was seen leaving the area of the bank shortly after the robbery and was suspected to have been involved in the robbery. Uher was told the suspect vehicle was traveling southbound on Highway 94 toward Cedar Rapids. Approximately seven minutes after the bank was robbed, Uher observed a gray Ford Taurus heading southbound on Highway 94 approximately 5.8 miles from the bank. Uher immediately turned his vehicle around and stopped the suspect vehicle.

In arguing that Deputy Uher lacked "reasonable suspicion" to pull over the gray Taurus, Defendants note that information regarding the vehicle's involvement in the bank robbery came from bystanders. After the four men in the pickup truck saw two men running from the bank, and circled the block, they observed the gray Taurus leaving the area. The men did not see the subjects enter the car, but based on the timing and location of the vehicle, they believed it may have been involved in the robbery. The men in the pickup truck were confident enough in their belief that they followed the gray Taurus out of Palo and south on Highway 94 toward Cedar Rapids. It was not until the men pulled

up near the subject vehicle and observed a white woman driving that they voiced some doubt regarding the vehicle's involvement. It was not until after the subject vehicle had been stopped, however, that Deputy Uher was advised the men in the pick up truck were reporting that the gray Taurus "may not be involved."

At the hearing, Deputy Uher conceded there are lots of gray Ford Tauruses on the road. However, this gray Taurus was located in the precise location and traveling in the right direction as one would expect from a gray Taurus reported by witnesses as potentially being involved in the bank robbery seven minutes earlier and six miles away. Clearly, Uher did not pull the subject vehicle over based on some "inchoate hunch." Rather, Uher was "aware of particularized, objective facts which, taken together with rational inferences from those facts," supported a reasonable suspicion that the subject vehicle may have been involved in recent criminal activity. "The Fourth Amendment only requires that police articulate some minimal, objective justification for an investigatory stop." *Tamayo-Baez*, 820 F.3d at 312. I believe that when Uher stopped the subject vehicle, he had a reasonable suspicion that the vehicle may have been involved in the bank robbery occurring just a few minutes earlier. I find no Fourth Amendment violation in conducting an investigative traffic stop.

### C. Length of the Vehicle Stop

Next, Defendants argue that even if the traffic stop was supported by reasonable suspicion, the duration of the stop exceeded the length of time permitted under the Fourth Amendment. A lawful traffic stop may "become unlawful if it is prolonged beyond the time reasonably required to complete the mission." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005) (quoted with approval in *Rodriguez v. United States*, ____ U.S. ____, 135 S. Ct. 1609, 1612 (2015)). That is, "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission.'" *Rodriguez*, 135 S. Ct. at

8

1614. *See also Florida v. Royer*, 460 U.S. 491, 500 (1983) ("The scope of the detention must be carefully tailored to its underlying justification.").

The traffic stop in this case was not lengthy. From the time the vehicle was pulled over until Defendants Monden and Mosley were found in the trunk was approximately 3-1/2 minutes. Defendants argue, however, that the "mission" of the investigative stop had ended before then. Here, the mission of the stop was to determine whether the vehicle was involved in the bank robbery. The officers were permitted to detain the vehicle until that mission was reasonably concluded, but no longer. Stated otherwise, "an investigative stop must cease once reasonable suspicion or probable cause dissipates." *United States v. Watts*, 7 F.3d 122, 126 (8th Cir. 1993).

In arguing that the vehicle stop in this case was unduly prolonged, Defendants seize on the fact that Deputy Uher was twice prepared to "cut loose" the vehicle, but did not do so after receiving further instructions from another deputy over the radio. Uher, who is not routinely assigned to patrol duties,[6] initially advised Defendant Pihl that she was free to go after she identified herself.[7] Uher was instructed by a deputy on the radio to obtain additional information regarding where Pihl was coming from and what she was doing. After the subject vehicle had traveled only a few feet, Uher approached the driver's window again and obtained the additional information. Once again, Uher was prepared to let Pihl go. It was suggested by another deputy on the radio, however, that he first check the trunk.

I believe the vehicle stop in this case was not unlawfully prolonged in violation of the Fourth Amendment. The "mission" of the investigatory stop was to determine whether the vehicle was involved in the recent bank robbery in Palo. Deputy Uher was authorized

---

[6] Deputy Uher generally works in the civil division, assisting with "domestic abuse move-outs, evictions, court-ordered property seizures, small claims, child removals, things like that."

[7] Pihl could not produce a valid driver's license, but truthfully gave her name to Uher.

to detain the vehicle for the time "reasonably required to complete the mission." *Caballes*, 543 U.S. at 407. The fact that Uher needed input from other deputies on the radio to complete the mission is not constitutionally significant. That is, if it was reasonable in conducting the investigation to ask the driver of the gray Taurus where she was coming from or what she was doing, then it is irrelevant whether Uher decided on his own to ask those questions, or if he was instructed to do so. Defendants argue that once it was determined the vehicle was being driven by a white woman, then it was "mission accomplished." Clearly, however, the circumstances justified a more thorough investigation, including a determination of whether anyone was hiding in the trunk. I believe the vehicle stop did not extend beyond that permitted by the Fourth Amendment.

### D. *Standing to Challenge the Trunk Search*

Defendants argue the officers did not have probable cause to search the trunk of the vehicle. Preliminarily, however, the Court must consider the Government's argument that Defendants do not have "standing" to challenge the legality of the trunk search.[8]

The gray Ford Taurus stopped in this case was owned by Farrah Franklin. Franklin's husband, Cedric Lamar Rivers, testified at the suppression hearing.[9] Rivers

---

[8] Before addressing the issue of whether Defendants have "standing" to challenge the legality of the trunk search, I pause to discuss terminology. In *Minnesota v. Carter*, 525 U.S. 83, 87 (1998), the Supreme Court was critical of the Minnesota Supreme Court for analyzing a similar issue as one of "standing." The Court noted that in *Rakas v. Illinois*, 439 U.S. 128, 140 (1978), it found that "definition of those [Fourth Amendment] rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing." *Id.* at 88. The Eighth Circuit Court of Appeals discussed this change in *United States v. Sturgis*, 238 F.3d 956, 958 (8th Cir. 2001) ("Two terms ago, the Supreme Court reaffirmed its earlier rejection of 'standing' nomenclature."). Nonetheless, while discussing the substantive issue of whether a defendant has a reasonable expectation of privacy in the searched property, judges and lawyers still commonly refer to the issue as one of "standing."

[9] Rivers was called as a witness by Defendant Pihl's attorney. It was not anticipated that Rivers would testify and, therefore, he was in the courtroom during at least a part of the testimony by Deputy Uher and Sergeant Bueter.

10

testified he uses Franklin's car with her permission.[10] Rivers described Defendant Monden as "a friend of mine." When asked about Defendant Mosley, Rivers testified that "I've seen him a couple times, but nothing like that." Rivers denied knowing Defendant Pihl and had never seen her prior to the hearing.

Rivers testified that on the day of the robbery (May 20, 2016), he took the car with Franklin's general permission. Franklin was not home at the time, and did not have actual knowledge that the car was missing. At some point, Rivers transferred the car to Monden and gave Monden permission to use it. According to Rivers, he did not know why Monden needed the car and did not know when Monden was going to bring it back. Rivers denied he knew Monden was going to use the car to rob a bank. Rivers testified he learned "what happened" a few hours later. Rivers called Franklin after learning what happened and described Franklin as "shook up and scared."

On cross-examination, Rivers admitted that Monden did not have Franklin's permission to use the vehicle. Specifically, Franklin did not know Monden was using the vehicle on May 20, or that Pihl was going to be driving the car. In fact, Franklin told Rivers prior to May 20 that Monden was not to use her car. According to Rivers, "she'd tell me don't be letting nobody else use the car."

According to a "Calls For Service Report," Franklin called the Cedar Rapids police department at 4:12 p.m. on May 20 and reported the vehicle stolen. According to the report (Exhibit 9), it "happened around noon today." For reasons which are not entirely clear to me, the report was not fully investigated at that time. Sergeant Theodore Bueter, a detective with the Linn County Sheriff's Office, testified that Franklin was subsequently interviewed on July 13, 2016. Franklin denied recognizing the names of the Defendants, and denied giving any of them permission to use the car.

---

[10] Rivers does not have a valid driver's license, but he drives nonetheless.

In its resistance to the motions to suppress, the Government argues that anyone in possession of a "stolen" vehicle has no expectation of privacy and no standing to challenge an allegedly illegal search. Courts in other jurisdictions have stated unequivocally that a person in possession of a stolen vehicle has no standing to challenge a search of the vehicle. *See, e.g., United States v. Tropiano*, 50 F.3d 157, 161 (2d Cir. 1995) ("[W]e think it obvious that a defendant who knowingly possesses a stolen car has no legitimate expectation of privacy in the car."); *United States v. Lanford*, 838 F.2d 1351, 1353 (5th Cir. 1988) (holding that a possessor of a stolen car lacks standing to challenge the search of the car); *United States v. Hensel*, 672 F.2d 578 (6th Cir. 1982) (a driver has no legitimate expectation of privacy in a stolen vehicle); *United States v. Hargrove*, 647 F.2d 411, 412 (4th Cir. 1981) (the driver of a stolen vehicle does not have a legitimate expectation of privacy in the car and lacks standing to object to a search of the vehicle).

In a post-hearing supplemental brief, the Government concedes that the evidence at the hearing "may be sufficient to cast doubt on whether the car was technically 'stolen.'" Nonetheless, the Government argues the analysis is essentially the same. That is, the Government argues that because none of the Defendants had Franklin's permission to possess the vehicle, none of the Defendants have standing to challenge an allegedly illegal search of the trunk.

Iowa law distinguishes theft of a motor vehicle from operating a motor vehicle without the owner's consent, depending on the actor's intentions. *Compare*, Iowa Code § 714.1 with § 714.7. If a person takes possession or control of a car without the consent of the owner, but without the intent to *permanently* deprive the owner of the property, then they may be prosecuted for operating without the owner's consent. Iowa Code § 714.7. Here, none of the Defendants had the owner's consent to possess or control the gray Taurus. In his post-trial brief, however, Monden argues he had Cedric Rivers' permission

to use the car, had used the car in the past, and was unaware of Franklin's directive that no one else was permitted to use the car.

The issue before the Court is whether Defendants had a legitimate expectation of privacy in the vehicle and, therefore, have "standing" to challenge the trunk search. A defendant must show a "legitimate expectation of privacy" in the property searched to assert a Fourth Amendment violation. *Rakas v. Illinois*, 439 U.S. 128 (1978). The Supreme Court has identified a two-part test to determine whether a person has a legitimate expectation of privacy in the place searched. "A court must determine: (1) whether the petitioner has asserted a subjective expectation of privacy, and (2) whether the petitioner's subjective expectation is objectively reasonable." *Smith v. Maryland*, 442 U.S. 735, 740 (1979). The Eighth Circuit has identified factors which may be considered by the Court in making a determination on standing.

> Factors relevant to the determination of standing include: ownership, possession and/or control of the area searched or items seized; historical use of the property or items; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific factors of the case.

*United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994); (citing *United States v. Sanchez*, 943 F.2d 110, 113 (1st Cir. 1991)).

In *Gomez*, the vehicle was stopped by a state trooper for speeding. A subsequent search of the vehicle revealed cocaine hidden in a secret panel in the car's backseat. Gomez testified he did not own the car, and the owner did not give him permission to use it. A third-party told Gomez that the owner had given permission for its use. *Id.* at 256. The Court concluded that Gomez did not have a reasonable expectation of privacy in the car and, therefore, had no standing to challenge the legality of the search. *Id.* The *Gomez* Court noted that the case was very similar to *Sanchez*, where the driver of the vehicle "had

13

only casual possession of the car, and no direct authority from the owner to use it." The First Circuit Court of Appeals in *Sanchez* found the defendant lacked standing to challenge the search. *Id.*

Also instructive is the Eighth Circuit's holding in *United States v. Muhammad*, 58 F.3d 353 (8th Cir. 1995). There, a rental car was leased in another person's name and Muhammad "presented absolutely no evidence that he had been granted permission to use the vehicle." *Id.* at 354. The parties agreed that "the defendant must present at least some evidence of consent or permission from the lawful owner/renter to give rise to an objectively reasonable expectation of privacy." *Id.* at 355 (citing *Gomez*). Because Muhammad failed to make a "showing of consensual possession to satisfy the standing requirements," he was not permitted to challenge the legality of the search. *See also United States v. Kiser*, 948 F.2d 418, 424 (8th Cir. 1991) (a defendant who had "some type of possessory interest or control" over a car, but did not have title to the vehicle and was not present when the search was conducted, had no standing to challenge the illegal search).

In *United States v. Rose*, 731 F.2d 1337 (8th Cir. 1984), the Court rejected the Government's argument that the defendant lacked standing to challenge the search of the trunk of a car in which he was a passenger. The facts in *Rose* are distinguishable, however, from the facts in this case. There, the owner of the vehicle (Rose's sister) had given him permission to use the car, Rose had keys to both the ignition and the trunk, he drove the car as much as two or three times a week, and his use of the car on the date of the search was permissive. *Id.* at 1343. In the instant action, none of the Defendants were given permission to use the vehicle by its owner and, in fact, the owner of the gray Taurus specifically told her husband (the only permissive driver) that no one else was to use it.

Similarly, the Court rejected the Government's standing argument in *United States v. Williams*, 714 F.2d 777 (8th Cir. 1983). In that case, the owner of the vehicle knew

14

that the person she was living with would occasionally permit his aunt to use the car. The owner's cohabitant gave his aunt permission to use the car on the day of the bank robbery. "[T]his approval provided Williams with a sufficient expectation of privacy in the vehicle to have standing in this case to assert her fourth amendment claims." *Id.* at 779, fn. 1. Critically, however, the permission given by the third-party in *Williams* was with the owner's knowledge. Here, Franklin did not know that Rivers had given Monden permission to use the car and, in fact, specifically instructed Rivers that no one else had permission to use it.

It cannot be fairly said that the gray Taurus in this case was stolen. It is clear, however, that none of the Defendants had the consent of the car's owner to drive or possess it. Monden argues, however, that because he received permission from Rivers to drive the car, he had a reasonable expectation of privacy, even as he was hiding in the trunk. I find the argument unconvincing.

After considering the totality of the circumstances and the authority set forth above, I do not believe Defendants had a legitimate expectation of privacy in the trunk of the gray Ford Taurus. None of Defendants had the owner's consent to drive or possess the vehicle and, in fact, possession of the car by anyone other than Franklin's husband violated her directions. While it appears Monden may have used the vehicle on some prior occasions, he did not use it routinely, he did not use it with Franklin's knowledge, and he did not have keys to the vehicle. At most, Monden had "only casual possession of the car, and no direct authority from the owner to use it." *Sanchez*, 943 F.2d at 113. The fact that Rivers gave Monden permission to use the car is unavailing. *Gomez*, 16 F.3d at 256 (finding Gomez did not have a reasonable expectation of privacy, despite being told by a third-party that the owner had given permission).

There is no evidence Monden or the other Defendants had a subjective expectation of privacy in the vehicle. Even if Monden subjectively believed he had a right of privacy

15

to the trunk of the car, such subjective expectation is not objectively reasonable. *Rakas*, 439 U.S. at 148-49 (mere passengers "simply would not normally have a legitimate expectation of privacy" in the trunk of an automobile). Because Defendants did not have a legitimate expectation of privacy in the vehicle, they lack standing to challenge the legality of the trunk search. Defendants' motions to suppress should be denied on that basis.

### E. Legality of the Trunk Search

As set forth above, I believe Defendants do not have standing to challenge the legality of the trunk search. Accordingly, it is unnecessary for the district court to address the issue of whether the search of the trunk violated the Fourth Amendment. In the event the district court disagrees with my analysis on standing, however, I will next address the issue of whether the trunk search violated the Fourth Amendment.

The Fourth Amendment protects persons against unreasonable searches and seizures. Searches conducted without a warrant are presumptively unreasonable, subject to a few well-established exceptions. *United States v. Kennedy*, 427 F.3d 1136, 1139 (8th Cir. 2005). One such exception is the so-called "automobile exception." "[T]he automobile exception 'justifies searches without prior recourse to the authority of a magistrate so long as the overriding standard of probable cause is met.' No exigency beyond that created by the ready mobility of an automobile is required for a warrantless search of a car to fall within the exception." *United States v. Blaylock*, 535 F.3d 922, 926 (8th Cir. 2008) (quoting *California v. Carney*, 471 U.S. 386, 392 (1985)). *See also United States v. Davis*, 569 F.3d 813, 816 (8th Cir. 2009) (noting that the automobile exception "authorizes officers to search a vehicle without a warrant if they have probable cause to believe the vehicle contains evidence of criminal activity").

In this case, however, the Government apparently concedes that the officers lacked probable cause to search the vehicle's trunk. Accordingly, the "automobile exception"

16

does not provide the Government safe harbor. Instead, the Government relies on another well-established exception to the warrant requirement — consent. *United States v. Chaidez*, 906 F.2d 377, 380 (8th Cir. 1990) ("Even when police officers have neither probable cause nor a warrant, they may search an area if they obtain a voluntary consent from someone possessing adequate authority over the area."). The Government argues Defendant Pihl voluntarily consented to the search by opening the trunk of the vehicle.

While Defendants frame the issue as whether or not Pihl consented to a search of the trunk, I believe the issue is more properly defined as whether Pihl's consent to search the trunk was *voluntary*. That is, by pulling the trunk release lever and allowing officers access to the trunk, Pihl impliedly consented to the search. The fighting issue, however, is whether her consent was voluntary.

Consent is voluntary if it was "the product of an essentially free and unconstrained choice by its maker," rather than "the product of duress or coercion, express or implied." *Id.* (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225-27 (1973)). The prosecution has the burden of proving voluntariness by a preponderance of the evidence. *Id.* In determining whether consent is voluntary, the Court must consider the totality of the circumstances. *Id.* The totality of the circumstances includes the characteristics of the person giving consent and the "environment" in which the consent was given. *Id.* at 381.

One of the factors which the Court may consider is whether Pihl was "requested" to open the trunk or "directed" to open the trunk. Initially, Deputy Uher testified that "I asked Ms. Pihl if she would pop the trunk." When asked if he recalled the specific words he used, Uher testified it was "something similar to, hey, can you pop the trunk." Uher denied "demanding" that Pihl open the trunk. Pihl responded to the request by opening the trunk using the trunk release found inside the vehicle. Uher could not recall Pihl making any comment. On cross-examination, Uher again testified he could not remember his exact phraseology, "but I think it was something like, 'hey, pop the trunk

17

of your car.'" Uher then immediately corrected himself by saying "hey, would you." Uher conceded that "pop the trunk of your car" — without "can you" or "would you" — is "more of a directive than a request."

The Court was provided with little information regarding Pihl's "personal characteristics." The Government did not seek Pihl's detention at her initial appearance and, therefore, no pretrial services report was prepared. Pihl is clearly an adult, but the record is silent regarding her "general intelligence and education." *See Id.* (enumerating personal characteristics which may be considered in determining whether consent is voluntary). Similarly, the Court is unaware of Pihl's prior encounters with the legal system and whether she was aware of her right to refuse consent. There is no evidence that she was intoxicated or under the influence of a controlled substance when consent was given.

Turning to the "environment" in which consent was given, immediately after the vehicle stop Pihl was approached by Deputy Uher with his gun drawn. She was instructed to place both hands out the window. Almost immediately, however, Uher holstered his weapon and the encounter became more conversational. There were three deputies present when Pihl consented to open the trunk, but she was not being threatened or physically intimidated at that time, and she was not under arrest. *See Id.* (identifying factors in the environment affecting whether consent is voluntary).

In support of its argument that Pihl's consent was voluntary, the Government cites three Tenth Circuit cases. In *United States v. Contreras*, 506 F.3d 1031 (10th Cir. 2007), the Court concluded that a driver's consent to search the trunk of her vehicle was voluntary. Among other things, the Court noted the officer's "casual phrasing of the request," his tone of voice, his lack of a show of force, and the fact that the stop was in broad daylight. *Id.* at 1037. *See also United States v. Gigley*, 213 F.3d 509 (10th Cir.

18

2000), and *United States v. Flores*, 48 F.3d 467, 469 (10th Cir. 1995) (by opening her trunk, the driver voluntarily consented to its search).

The factors listed in *Chaidez* "should not be applied mechanically." *Id.* Rather, the Court must consider all of the surrounding circumstances in determining whether consent was given voluntarily. Here, Deputy Uher testified he asked Pihl "can you pop the trunk" or "would you pop the trunk." Pihl immediately and without comment complied. She was not threatened or coerced by the officers, and there is no evidence that Uher raised his voice or otherwise intimidated Pihl. The encounter took place on a public road and in broad daylight. After considering the totality of the circumstances, I conclude Pihl voluntarily consented to a search of the trunk. Accordingly, even *if* Defendants have standing to challenge the legality of the search, there is no constitutional violation.

### F. *Fruit of the Poisonous Tree*

Defendants argue that the search warrant for the vehicle obtained following the stop was fruit of the poisonous tree. Defendants apparently concede that the information contained on the search warrant application supports a finding of probable cause. Defendants argue, however, that the information was obtained following an unlawful vehicle stop and illegal search. I believe the premise of Defendants' argument fails and, therefore, their challenge to the validity of the search warrant also fails.

### VI. *SUMMARY*

In summary, I believe Defendants have standing to challenge the legality of the vehicle stop. I further conclude, however, that the vehicle stop was supported by reasonable suspicion that the vehicle was involved in criminal activity and, therefore, was not violative of the Fourth Amendment. I also conclude that the vehicle stop did not exceed the length permitted by the Fourth Amendment to complete its mission.

In my view, Defendants do not have standing to challenge the legality of the subsequent trunk search. Even if standing exists, however, I believe the search was

19

Case 1:16-cr-00051-LTS-CJW Document 56 Filed 07/29/16 Page 19 of 20

pursuant to voluntary consent and, therefore, not a violation of the Fourth Amendment. Finally, because both the stop and the search were legal, the subsequent search warrant is not fruit of the poisonous tree.

## VII. RECOMMENDATION

For the reasons set forth above, I respectfully recommend that Defendants' Motions to Suppress (docket numbers 40, 43, and 47) be **DENIED**. The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court. *The parties are reminded that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections." Accordingly, if the parties are going to object to this Report and Recommendation, they must promptly order a transcript of the hearing held on July 18, 2016.*

DATED this 29th day of July, 2016.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA